## STATE v. LEE.

1. CONTINUANCE.—No error in refusing motion for continuance here.
2. EVIDENCE.—DYING DECLARATIONS must be made while deceased is *in extremis,* while he has no hope of recovery, and must refer to the circumstances attending the killing.
3. IBID.—IBID.—OPINION—EVIDENCE.—The statement of the deceased that the defendant shot him "for nothing," "a drunken fool," and that he did it wilfully and maliciously, admitted as dying declarations, being parts of one statement, and the latter held not objectionable, because the opinion of the deceased.
4. CHARGE.—Errors committed in a preliminary charge may be corrected in final charge.
5. HOMICIDE.—CHARGE as to accidental homicide, when construed with reference to whole charge, not objectionable.
6. EVIDENCE—THREATS.—There is no limit to time within which a threat should have been made to render it competent; but where much time has elapsed between threat and act, it is a circumstance to be considered by the jury in determining if there is any connection between the two.

Before BENET, J., Darlington, November, 1899. Affirmed.

Indictment against Maxcy C. Lee for murder. The record contains the following in reference to the motions for continuance:

When the defendant was arraigned and asked if he was ready to go to trial, his counsel moved a continuance of the case to the next term of Court, basing the motion upon the ground that the tragedy had but recently occurred, the defendant had not had sufficient time under the circumstances to prepare for his trial, the homicide having occurred on the 5th day of October, 1899, and upon the following physician's certificate: "Darlington, S. C., October 25th, 1899. This is to certify that I have several times lately examined Dr. Maxcy G. Lee and find his physical condition fair, but he is by no means a well man. I also find that his nervous system is very bad. He is extremely nervous and has not yet

recovered from the shock incident to the cause of his incarceration.　He has had two hemorrhages, which may be due to his confinement.　In my opinion, for him to go to trial now would jeopardize his health.　A. T. Baird, M. D., County Physician."　His Honor, without deciding the motion, desired a further certificate from the physician as to the nature of the defendant's hemorrhages.　Accordingly on the next day, to wit: the 26th day of October, the following certificate was presented to the Court, and the motion for continuance renewed: "Darlington, S. C., October 26th, 1899. The hemorrhages mentioned in my former certificate were, as I have been told by Dr. Lee, from his lungs.　I was not present when they occurred, one of which took place on the night of the 24th, but my examination of his lungs revealed a condition that always follows such hemorrhages.　I think that he is not in a condition to go to trial at this time.　A. T. Baird."　Without deciding the motion, his Honor fixed the 6th day of November for the trial of the case, stating that the defendant might then be prepared to go to trial, and in fit physical condition to do so.　On that day the case was again called up for trial, the defendant's motion for continuance was again renewed upon the same grounds, as well as upon the following physician's certificate: "Darlington, S. C., November 6th, 1899.　This is to certify that we have examined and visited Dr. Maxcy G. Lee several times within the past few days.　We find his nervous system very much disturbed and disordered.　His physical condition is very bad; we do not think he is in a fit condition to go to trial at this time.　A. T. Baird, M. D., Jas. M. Earle, M. D."　His Honor ordered the case to go to trial.

Addendum by trial Judge: It is proper to add that when I fixed the 6th November for the trial, I also deferred the consideration of the motion for continuance until that day, and stated that the defendant might renew his motion on that day.　Accordingly, on 6th November, the motion was again made, and an additional medical certificate submitted. I was impressed with the unsatisfactory, vague and unsub-

stantial nature of the grounds for the motion, the more so since the defendant's own appearance and manner, and manifest physical condition, seemed to contradict the certificates. And the result showed conclusively that he was strong enough and well enough to stand the ordeal of the trial. I am still of the opinion, as I then was, that the grounds for continuance were very far from being sufficient.

From sentence of life imprisonment in the penitentiary, the defendant appeals.

*Messrs. Woods & Macfarland,* for appellant, cite: *So-called dying declarations, inadmissible:* 26 S. C., 153; 35 S. C., 295; 118 Mo., 491; 12 Bush., 271; 80 Ia., 37; 105 Ind., 469. *Same rules apply to preliminary as to final charge:* 55 S. C., 249. *As to charge on facts:* Art. V., sec. 26, Con. 1895; 49 S. C., 294, 550; 48 S. C., 147. *Error to leave what was care and what was criminal negligence to jury:* 42 S. C., 408. *As to Judge intimating opinion on facts during trial:* 50 S. C., 293; 36 S. C., 544; 15 S. C., 392; 19 S. C., 581; 28 S. C., 577.

*Messrs. Boyd & Brown,* also for appellant, cite: *Rules as to admission of dying declarations:* 40 Am. St. R., 410; 34 S. C., 139; 26 S. C., 155; 13 Rich. L., 348; 13 S. C., 463; 50 Mo., 375. *So much of the declaration as stated the opinion of the deceased, was incompetent:* 19 S. C., 525; 19 S. C., 70; 65 Am. St. R., 345. *Error for Judge to intimate his opinion of weight of dying declarations, that is for jury:* 15 Rich. L., 350; 35 S. C., 296; 36 S. C., 544; 50 S. C., 300; 28 S. C., 577.

*Solicitor Johnson,* contra.

July 31, 1900. The opinion of the Court was delivered by

MR. JUSTICE GARY. A general statement of the facts herein is correctly set forth in the argument of the appellant's attorneys as follows: "October 5, 1899, Maxcy C. Lee, a young physician, was living with his aged father, Dr. Henry J. Lee, in Darlington County, near a little hamlet

22—58

called Lydia. The father and son had thus been living together for about five years, engaged in the practice of medicine in partnership. Dr. Henry Lee had lost his wife some three years before; his other children had married and settled around him at varying distances, and Maxcy, who was unmarried, was his sole companion, the only other inmate of his house being a white woman—a Mrs. Munn—employed as cook and housekeeper. Dr. Henry Lee had reached the age of seventy, and was held in high esteem and much beloved throughout the surrounding country. He was well-to-do, owning at least $25,000 in property, mainly in money. As a general thing, the relations between father and son were of the most cordial and affectionate character, and when the old man was unwell, it was the practice of the son to sleep with him, so as to administer to his needs during the night. Both men, however, at times, drank to excess, and at times quarrelled violently, being both of passionate nature. These quarrels, as far as the testimony shows, were followed by speedy reconciliations. They occupied bed rooms in the rear part of the body of the house, fronting each other, across a wide passage, and the doors of these rooms were in line for the free circulation of air. As Maxcy Lee said, the house was built for ventilation. Dr. Henry Lee's room was on the right to one going down the passage from the front door of the house, and Maxcy Lee's on the left. Some two weeks' or ten days before the fatal occurrence, Maxcy Lee had borrowed from a friend at Darlington C. H.—one Early—a double-barrelled hammerless breech-loading gun, of superior make and value, for the purpose, he said, of killing some turkeys that had become wild; and had obtained to go with it No. 3 or 4 shot. This gun was regarded as a curiosity worth looking at by Maxcy Lee, and friends of his called in, or were called in, to examine it. There was some difficulty in unbreeching and working it, and Maxcy being unskilful in so doing, his father handled the gun for inspection. The gun had its place in Maxcy's room, while the father had a gun that was kept in his own

room. October 5th, Maxcy Lee went to Darlington C. H., and while there obtained permission from Early to retain the gun a little longer. He returned home late in the day, riding with his brother, Dickson Lee, who came with him. They had whiskey with them, and on reaching home, some hot water was obtained, and father and sons together took a toddy. As far as the testimony shows, they were on the best of terms, and were seated together in the bed room of the father. No dinner had been put up, or prepared, for Maxcy, and he ordered an early supper, and was perhaps put out because he had nothing to eat. The father asked about the Early gun, and Maxcy said Early had sold it for $100. Sim Woods, a colored servant, was present, and asked to see the gun, and being told to do so, he got the gun from Maxcy's room and handed it to Dr. Henry Lee, who unbreeched it. Sim said it was unloaded, but he failed to put himself in a position to ascertain the fact. The old man was seated when he handled the gun, and Sim and Maxcy were standing, and unless Sim had been standing just behind the stock of the gun, he could not have seen whether or not it was loaded; one barrel certainly was unloaded. After the gun had been replaced, Sim was told to go after the mail. It was raining, and looking for an umbrella, Sim found that Maxcy's was broken. Upon this Maxcy spoke very roughly and angrily to Mrs. Munn, reproaching her for not taking better care of his property. As far as the testimony shows, this roughness of the son did not offend the father. They were, apparently, sitting there in the father's bedroom on the friendliest of terms, the one imparting the news of the court house to the other. The 2d of October had been the father's birthday, and as a birthday present, the son had given him a gold watch chain. Dickson had left, and Dr. Henry Lee had walked out to the road to meet Sim and receive his mail; while there Mrs. Munn, doubtless offended by Maxcy's rough talk, came out of the house with a bundle. The old doctor directed her to go back, but saying that she could not, she went her way. The

old man got his mail—papers and letters—and went to the
house. Sim and another negro were at the well, near the
road. They saw him enter the house, and directly after-
wards, as they say, they heard the report of the gun. Dr.
Henry Lee said, 'As I came down the passage, Maxcy shot
me from the door; he was in eight feet of me.' If Sim
heard aright, he said further that Maxcy was standing in his
(Maxcy's) room door, and shot him as he turned to go into
his (Dr. Henry Lee's) room door. Maxcy Lee said that 'he
was still in his father's room when the old man returned with
the mail. That he (Maxcy) took his letters and went into
his own room and sat on his bed, working with the gun in
his lap. That his father came out in the·passage and stood
in front of him eating an apple, when the gun fired.' " The
defendant was found guilty, with a recommendation to
mercy, and sentenced to life imprisonment in the State peni-
tentiary.

He appealed upon the following exceptions: "I. That his
Honor abused his discretion in refusing to continue the case
in accordance with the motion of the defendant, made on
the 25th and 26th days of October, as it is respectfully sub-
mitted that said case should have been continued upon the
physician's certificate presented for that purpose on said
days. II. That his Honor abused his discretion in refusing
to continue the case under the physician's certificate pre-
sented of date November 6th, 1899, to which day he had
postponed the trial of the case from the 26th day of October,
it being respectfully submitted that under said certificate, the
defendant was not in any condition to undergo the strain of
a serious trial, and the case should have accordingly been
continued. III. Because it is respectfully submitted that
his Honor, the Circuit Judge, abused his discretion in
refusing, when said certificate of date November 6th was
presented and motion made for continuance, to allow de-
fendant's counsel to call into Court the physician to more
abundantly and fully show that defendant was not in fit
physical condition to stand the trial. IV. His Honor erred

in charging the jury, in his preliminary charge, as follows: 'If you come to the conclusion by the preponderance of the evidence that the killing was accidental, you will then have to determine whether it was such an accidental killing as should be allowed to go unpunished, or whether it belongs to another class of accidental killings that requires to be punished. If you come to the conclusion that it was not accidental, then you will have to determine whether it was unlawful homicide; and, if so, whether it was murder or manslaughter.' His Honor thus, it is respectfully submitted, making the conclusion of the jury, as to the guilt or innocence of the defendant, dependant upon a preponderance of the evidence, thus throwing the burden upon the defendant of establishing his innocence, and not upon the State to prove his guilt beyond a reasonable doubt upon the whole case; thereby misleading the jury in laying down the rules of law by which they were to consider the testimony, inasmuch as in his entire preliminary charge he failed to instruct the jury to the effect that upon the whole case, including the evidence as to the special defense, the jury must be satisfied of the guilt of the defendant beyond a reasonable doubt. V. If some accidental homicides are punishable in law, as his Honor instructed the jury, his Honor erred in charging the jury in his said preliminary charge, 'The defendant, as I understand from his counsel, does not deny the fact of the killing, but sets up a plea that it was accidental.' And again in charging, 'But he pleads that it was an accidental killing.' Thus indicating to the jury that the defendant had set up a plea which furnished no excuse in law, and misstating what the defendant's plea was, the defendant having pleaded not guilty to the indictment, and set up the plea of excusable homicide by reason of the fact that the killing was done accidentally, without criminal carelessness on his part. VI. His Honor erred in instructing the jury in his said preliminary charge as follows: 'The defendant, who sets up the plea of accidental killing, takes upon himself the burden of proving that the killing was accidental. He is not required

·to prove that beyond a reasonable doubt; but the law re-
quires him to establish that plea by the preponderance of the
evidence, by the greater weight of the testimony.' Inas-
much as he failed in his said preliminary charge also to in-
struct the jury that the defendant must have the benefit of
every reasonable doubt upon a consideration of the entire
testimony in the case, the jury thus being under a misappre-
hension as to the rules of law by which they were to be gov-
erned while they were hearing the evidence in the case.
VII. His Honor erred in instructing the jury as follows:
'The jury must gather from the testimony four requisites of
the plea of accidental homicide, which I hope the jury will
bear in mind. *First,* the jury must be satisfied by the pre-
ponderance of the evidence that the killing was indeed and in
truth accidental; that no element of intention entered into
the act. *Second,* that at the time of the killing, the defend-
ant was not engaged in any unlawful occupation or doing
any unlawful act. *Third,* that if he was engaged in a lawful
occupation or doing a lawful act, that he was doing so with
a due regard to the lives and persons of the bystanders or
those in the range of the danger; and the jury is to be the
judge of the amount of care and caution to be exercised
under the various circumstances. *Fourth,* it should be
shown to the satisfaction of the jury by the preponderance
of the evidence that the defendant at the time of the killing
had no intention to kill or injure the deceased or any one
else.' The said charge, it is respectfully submitted, being
incomplete, to the disadvantage of the defendant, and not in
accordance with law. It was incomplete and so calculated
to mislead the jury: 1. In that it failed to add that whatever
the conclusion as to the preponderance of the testimony in
respect to the special plea, the defendant could be convicted
only in case, upon the whole testimony, the jury should be-
come satisfied of his guilt beyond a reasonable doubt. 2. In
that it failed to instruct the jury, in the case of unlawful
occupation at the time of the killing, as to the difference in
the character of the offense and the degree of a crime de-

pendent on whether the defendant was engaged in the commission of a felony or in the commission of a misdemeanor. 3. And that in the matter of negligent killing, it failed to instruct the jury that the negligence must be more than would be sufficient as a basis for a civil action for damages, and must be so gross as to become culpable, and afford a reasonable ground for the implication of malice. The charge was not in accordance with law, in that it made the jury sole judge of the amount of care and caution to be observed, when, it is submitted, that the negligence in such case presents a mixed question of law and of fact, and the jury should have been instructed as to what constitutes criminal negligence in law. VIII. His Honor erred in his said preliminary charge, in instructing the jury that they' must gather from the testimony as one of the requisites of accidental homicide, 'That at the time of the killing the defendant was not engaged in any unlawful occupation or doing any unlawful act;' without also explaining to or instructing the jury that said unlawful act must be one out of which the killing arose. IX. His Honor erred in his said preliminary charge in utterly failing to charge the jury that the defendant must be acquitted, unless the jury should be satisfied from a consideration of the whole testimony adduced that the defendant was guilty beyond a reasonable doubt, and that it was the duty of the State to make out its case accordingly; thus leaving it to the jury to reason upon and weigh the testimony while they were hearing it upon the mere preponderance of the evidence, and placing the burden upon the defendant to prove his innocence on his special defense. X. His Honor erred in admitting in testimony a statement of the witness, Sim Woods, as to what he said occurred between the deceased and defendant a week or two before the killing, and a conversation which took place between them, the same having no relevancy to the issue, involving no threat applicable to the killing, indicating in no way the relations between the defendant and the deceased on the 5th of October, 1899, and preceding a 'friendly living together and

harmonious intercourse, that had been put in testimony by the State. XI. His Honor erred in admitting the statement of the witness, Simon Woods, as to the alleged conversation between the defendant and deceased, and the abusive language used by him to Mrs. Munn, the evening of the killing, the said testimony being irrelevant to the issue, and not a part of the *res gestae,* and tended simply to prejudice the minds of the jury against the defendant. XII. His Honor erred in admitting the alleged dying declarations of Dr. H. J. Lee, testified to by the said witness, Sim. Woods, because it did not appear that at the time the alleged dying declarations were made, the deceased believed or was informed that death was imminent or impending, and because said alleged dying declarations did not relate to the circumstances of the killing, but the deceased was merely characterizing the act and expressing his opinion, unsupported by circumstances, and which he would not have been allowed to testify to under oath had he survived. XIII. His Honor erred in permitting the witness, Dr. Wallace, to testify to alleged dying declarations of the deceased, because it was not made to appear that the deceased believed or was informed that death was imminent or impending at the time said alleged declarations were made, and because they involved a mere opinion of the deceased, unsupported by any circumstances. XIV. Even if the alleged dying declarations stated by Dr. Wallace were otherwise competent testimony, his Honor erred, it is respectfully submitted, in refusing defendant's motion to strike out that part of the so-called dying declarations which clearly related to the matter of opinion expressed by the deceased. XV. His Honor erred in permitting the witness, Dr. Wallace, to state in the presence of the jury what the defendant said about his father five or six years or more before the killing, to the effect that one or the other of them would have to die before 9 o'clock that night, said testimony being utterly irrelevant to the issue, and being entirely remote from any proof of threats or motives to take the life of the deceased,

years thereafter, and tending only to prejudice the jury against the defendant.   XVI. His Honor erred in admitting in evidence the alleged dying declaration of the deceased, testified to by Mrs. M. V. Galloway, there not being sufficient evidence that the deceased, at the time the alleged declarations were made to her, considered that death was imminent or impending, and, if otherwise competent, said alleged dying declarations should have been excluded, because they did not relate to the circumstances of the killing, and were utterly incompetent to go to the jury as dying declarations of the deceased.   XVII. His Honor erred in permitting the witness, W. K. Thomas, to testify as to what the deceased said about his chances for living or dying, for the purpose of determining the admissibility of the alleged dying declarations of the deceased, which his Honor had already ruled to be admissible as such. XVIII. His Honor erred in interrogating the witness, W. K. Thomas, when recalled for the purpose of showing what the deceased said as to living or dying, and undertaking himself to extract from the witness testimony which the solicitor had failed to bring out; inasmuch as, by so doing, he invaded the province of the jury and indicated his opinion as to the value of the alleged dying declarations, and stepped beyond the province of the Judge in jury trials, contrary to the spirit, if not the letter, of art. V., sec. 26, of the Constitution. XIX. His Honor erred in permitting the witness, Mrs. S. E. Hay, to testify to alleged dying declarations of the deceased, there being no sufficient evidence to show that the deceased considered or believed that death was imminent or impending at the time said alleged declarations were made by him, and because, if otherwise competent, the said alleged dying declarations did not relate to the circumstances of the killing, but involved a mere opinion of the deceased, unsupported by circumstances.   XX. His Honor erred, during the examination of the witness, Mrs. S. E. Hay, in stating in the presence of the jury, 'I hold that the testimony justifies the opinion that there was a continuous dying condition of

which the deceased was aware, bearing in mind that he was
a medical man, and able, therefore, to form a more intelli-
gent opinion of his condition than a layman.' His Honor
thereby indicated his opinion as to the value or weight to be
given to the alleged dying declarations by the jury; his
Honor's duty being simply to pass upon the admissibility of
the testimony. XXI. His Honor erred in questioning the
witness, Dr. Wallace, when recalled by the solicitor, as to the
belief of the deceased as to whether he would live or die,
asking the witness a series of questions thereon, and endeav-
oring thereby to bring out by his examination testimony
which the solicitor had failed to bring out by asking the
witness leading questions tending to elicit the testimony
desired for the State, and by the form and manner of his
examination of said witness, indicating to the jury his opin-
ion upon a material question of fact for their consideration,
and thereby violating art. V., sec. 26, of the Constitution of
this State. XXII. His Honor erred, it is respectfully sub-
mitted, in admitting in testimony the alleged dying declara-
tions of the deceased, testified to by the witness, Henry
Thomas, because there was no sufficient evidence that at the
time the alleged dying declarations were made, the deceased
believed or was told that death was imminent or impending;
and because, even if said alleged declarations were otherwise
competent, they were inadmissible and incompetent, because
the statement by the deceased, that he was shot wilfully by
the defendant, was a mere expression of opinion from him,
unsupported by circumstances. XXIII. His Honor erred
in directing, of his own motion, that Dr. Wallace be recalled,
when Henry Thomas was upon the stand, for the purpose
of undertaking to prove by the former that the deceased was
in a dying condition at the time the alleged declarations, tes-
tified to by Henry Thomas, were made, and by himself
examining Dr. Wallace and putting to him such leading
questions and in such form and manner as to indicate to the
witness and to the jury his opinion upon a question of fact
for the consideration of the jury, to wit: The value of the

alleged dying declarations as testimony, and whether death was imminent and impending at the time; the sole province of the Judge on that question being to pass upon the admissibility of the testimony offered by the State. XXIV. His Honor erred, when passing upon the defendant's objection to the witness, Henry Thomas, stating what the deceased said to him as to the killing, by clearly indicating to the jury, in his remarks thereon, his opinion as to the force and value of the alleged dying declarations, the same being a question of fact for the jury; especially did his Honor err herein in his remarks as to admitting such testimony, by using the following language in the presence of the jury: 'A statement made by a dying person warned to state all the circumstances, for the purpose of being used as evidence, sometimes comes with a questionable coloring, because even a dying person may have a desire for vengeance on the person who kills him; but where statements are made without any warning that they are going to be used as testimony, they come into Court as dying declarations, if the Court is satisfied that the person was really in a dying condition and had no hope of recovery.' XXV. His Honor erred, when the witness, Henry Thomas, was being examined for the State by the solicitor, and objection was interposed by the defendant to his testimony, in directing, of his own motion, that the witness, Dr. Wallace, be recalled, and in taking out of the hands of the solicitor the examination of Dr. Wallace when so recalled, and attempting by his examination of said witness, to bring out all the facts as to witness' knowledge as to the condition of the deceased, and what he said, there being involved in his Honor's questions and in the witness' answers a very material inquiry for the jury, to wit: whether the deceased was in a dying condition, and as to the worth and value of the alleged dying declarations; it being respectfully submitted that such examination upon material and vital questions of fact for the consideration by the jury should be inquired of from witnesses by the solicitor and not by the presiding Judge. XXVI. His Honor erred, when defendant objected to cer-

tain testimony about to be elicited from the witness, O. D. Lee, in making the following remarks thereon: 'This, I apprehend, will relate to what was testified by Dr. Wallace as to a threat alleged to have been made four or five years ago.' His Honor thus stating in the presence of the jury that the remarks alleged to have been made about his father by the defendant years before the killing, and previously testified to by Dr. Wallace, constituted a *threat* by the defendant against his father—the same being a question of fact entirely for the jury; and thereby his Honor invaded the province of the jury in relation to the said question of fact, as to which they should have been left to reach their own conclusions, without any intimation of opinion by the Circuit Judge. XXVII. His Honor, in permitting the witness, Willie Warr, to testify to an alleged difficulty between deceased and defendant, and to go into the particulars thereof, that was alleged to have occurred a week before the killing, and which, it is submitted, was irrelevant to the issue; and it being further submitted that the State should have been confined to the proof of hostile relations that existed, if any, between the parties at the time of the killing, and not allowed to go into the particular instances of disputes or difficulties, and the details thereof. XXVIII. His Honor erred, in his final charge to the jury, in urging upon them to reach an agreement, and to change their individual conclusions upon the evidence; thus, it is submitted, leaving the members of the jury to conclude that the exercise of their separate independent judgments, if it should result in a disagreement, would be displeasing to the Court and abhorrent to the law; whereas, the exercise of such independent judgment by every juror is the basis of jury trial. XXIX. His Honor erred, it is respectfully submitted, in his said final charge, in that, although he instructed the jury that the burden of proof was on the defendant throughout to establish a special defense, yet he failed also to make it clearly evident to the jury that it was the duty of the State to prove the defendant's guilt, upon the whole case, beyond a reasonable doubt. XXX. His Honor erred

in charging the jury as follows: 'You will, therefore, take the evidence and determine for yourselves whether the defendant has satisfied you by the greater weight of testimony that he should be allowed to go free and unpunished;' thus leaving the jury to acquit or convict accordingly as the defendant had satisfied them that he was guilty or innocent. XXXI. His Honor erred in instructing the jury in his said final charge, that before they could acquit the defendant they must be satisfied by the preponderance of the evidence that the four requisites, which he laid down, were complied with and fully met; whereas, he should have instructed them that, although it rested upon the defendant to establish a special defense, yet before they could convict, they must be satisfied of the guilt of the defendant upon the whole case beyond a reasonable doubt.    His Honor's instructions herein being, it is submitted, especially misleading to the jury, although he did afterwards charge that the failure of the defendant to establish such special plea did not relieve the State of the burden of proving his guilt beyond a reasonable doubt. XXXII. His Honor erred in charging the jury, in respect to matters of fact, in violation of art. V., sec. 26, of the Constitution of this State, as follows: 'In this case, the State argues to you that murder has been proved by the dying declarations of the deceased and by circumstantial evidence, and by evidence of the admissions of the defendant.    You will recall that in the course of the trial, the Court was required repeatedly to pass upon the admissibility or inadmissibility of certain evidence; and if there is before you evidence of any statement made by the deceased before he died, but after the mortal stroke was given or the mortal shot was fired, such evidence has been admitted, if it be in the case, after the Court was satisfied that the dying man knew he was a dying man, and had no hope of recovery, and made a statement under the expectation of impending death.    If there is such evidence in the case for you to consider, all that my decision as to that evidence amounted to was that it was admissible as evidence, not that you are to take it as absolutely true, but

that you are to consider it just as you take evidence taken on the stand from a witness that has been sworn to tell the truth, the whole truth and nothing but the truth. It comes before you without being cross-examined; you are to weigh it and say from its internal evidence and from the other evidence in the case whether, in your opinion, it is true or not. Such evidence is admissible under the theory that a person who is on the verge of the grave, looking into the face of death, having given up hope of life, is free from any temptation to tell what is not true; and that his circumstances take the place of the oath administered to the witness in Court; and although such statements made by a dying person are, from their very nature, hearsay, and although generally hearsay is not admitted in Court as evidence, that is an exception to the rule, and such statements are admitted in evidence, and are to be considered by the jury.' XXXIII. His Honor erred in charging the jury as follows: 'If there is circumstantial evidence in the case, you will weigh it and ascertain what facts the State has proved. If the State has proved one or more facts by circumstantial evidence, then you will say what presumption arise out of those facts. In the majority of cases that come into the criminal Court, the State is bound to rely wholly or partly on circumstantial evidence, in contradistinction from the evidence of eyewitnesses, which is spoken of as positive testimony.' His Honor thus charging the jury as to matters of fact, in violation of art. V., sec. 26, of the Constitution of this State. XXXIV. His Honor erred in charging the jury as follows: 'If there are admissions of the defendant himself in evidence, you will consider them. They are admitted in evidence, being an exception to hearsay; they are admitted in evidence, and you are to determine whether or not they are true; and, if true, what is the effect as indicating or not the guilt of the defendant.' His Honor thus charging the jury with respect to matter of fact, and thus violating the provisions of art. V., sec. 26, of the Constitution of this State. XXXV. His Honor erred in charging the jury, 'that the defendant in this

case is not to be acquitted on the ground of accidental homicide, unless he has satisfied you by the greater weight of the testimony that he is entitled to be excused and go unpunished;' whereas, he should have charged that the defendant must be acquitted unless the State proved his guilt upon the whole case, including any special plea, beyond a reasonable doubt. XXXVI. His Honor erred throughout his said final charge, whenever charging the jury upon the matter of proof of a special defense, in failing to clearly state to the jury that the defendant must be convicted, if at all, upon the proof by the State of his guilt upon the whole case, including the testimony as to a special defense, beyond a reasonable doubt."

It will not be necessary to consider these' exceptions in detail, as all the questions presented by them can be disposed of under the heads arranged by the appellant's attorneys in their arguments.

The first question to be considered is whether there was error on the part of the presiding Judge in refusing the motion of the defendant for a continuance made on the grounds fully set forth in the record. After a careful consideration of the facts, we fail to discover any error in refusing the motion.

The next question for consideration is whether there was error in allowing the State to introduce in evidence the statements of the deceased as dying declarations. The appellant's attorneys interposed two objections to the admissibility of said testimony: It was objected to, first, that the conditions required for the admission of the testimony were not present, and next, that the declaration was an inadmissible expression of opinion. We will first consider whether the requisite conditions existed for the introduction of the said testimony. In Am. & Eng. Enc. of Law (2d ed.), 10th vol., 382, it is said: "As to their relevancy, dying declarations are governed by the same rules as testimony, except that they are restricted to the act of killing, and the circumstances immediately attending it, as forming

part of the *res gestae.*"    In the same volume, page 364, it is said: "In order that the dying declarations of a deceased person may be admissible, under the dying declarations rule, the declarant must, at the time of making them, have been *in extremis,* and fully conscious of his impending dissolution.    Both of these conditions must exist.    Thus it has been said, that it is not alone sufficient that the declarant believe that he is about to die; to be admissible under the dying declarations rule, his dying declarations must have been made while he was *in extremis.*    And even though the declarant was *in extremis,* his declarations are not admissible unless they were made by him while he was under a sense of impending death.    To render his declarations admissible, the declarant must not only believe that he is about to die, but must be without hope or expectation of recovery" * * * "According to the clear preponderance of authority, if the deceased had the slightest hope of recovery, when the declarations were made, they are inadmissible."    The rules are stated in *State* v. *Bradley,* 34 S. C., 139, as follows: "1st. Death must be imminent at the time the declaration was made.    2d.  The declarant must be so fully aware of this, as to be without hope of life.    3d.  The subject of the charge must be the death of the declarant, and circumstances of the death must be the subject of the declaration."    In *State* v. *Johnson,* 26 S. C., 155, it was said: "We are aware that cases have been cited and others might be, decided elsewhere, in which Courts have gone to extreme lengths in excluding dying declarations, as not coming fully up to the rule; but we do not think any set form of words should be required to show that the declarant was in such a condition as to render his declarations competent, but that the Court must draw a rational conclusion from all that was said, taken in connection with such surrounding circumstances as must have been known to the declarant, as to whether the declarant was in such a condition of mind as would render his declaration competent.    None of the cases in this State have gone to such lengths as we find in some of the cases elsewhere, and

we are not disposed to follow such cases." We have not undertaken to reproduce the testimony relevant to this question, as it would not be of any practical benefit. We are, however, fully satisfied that there was a compliance with all the requirements of law, and that there was no error in this respect, in allowing said testimony to be introduced.

We will next consider whether said testimony was inadmissible on the ground that it was the expression of an opinion. When the State offered to introduce in evidence the statement hereinafter mentioned, the following took place: "Mr. Woods: If your Honor please, my position is this, that that is a declaration on the part of the deceased of inferences from a state of circumstances which is not stated, and that the Court has laid down the rule that it must relate to the circumstances themselves, not to inferences, or conclusions from these circumstances. The general doctrine is that nothing can be stated by this witness in regard to the alleged dying declarations which the deceased, if living, would not be allowed to testify to in an action of assault and battery. Q. (By the Court to the witness) : Was what he said about a drunken fool part of the same conversation? A. Yes, sir. The Court: I cannot hold that the expression, 'he shot me for nothing,' or 'he killed me for nothing,' is purely an expression of opinion. It might be, and it might not be; just as an expression of, 'he shot me accidentally,' may or may not be a matter of opinion. It may be a matter of fact stated in that manner. It certainly is as much a matter of fact as if a dying person were to say, 'he shot me from anger,' or 'from jealousy,' or 'from revenge,' or 'because I struck him.' If the deceased knew of no cause for the shooting, it is difficult to see how he could have expressed that better than to say, 'he shot me for nothing.' But my ruling is not as to the expression 'he shot me for nothing,' alone. The statement is one statement, as I understand it from the witness, and concludes with the statement, 'to be killed by a drunken fool.' Mr. Woods: I think I had better put my objection in this form: I object to the

whole statement. Does your Honor rule the whole state-
ment in? The Court: If it is one statement. Mr. Woods:
Then I move to strike out the objectionable part and leave
the unobjectionable part in, even though it is one statement.
The Court: I must let the whole statement in. Exception
noted. The jury were now recalled. Q. Now state plainly
so that the jury can hear you, what the old doctor said about
the killing to his daughter, Mrs. Josey. A. He said:
'Fannie, Max has shot me.' He said: 'An old man three
score and ten, to raise up a son to kill him in his own house
for nothing, a drunken fool.' He said: 'Don't you think
this is a high state of civilization?' " The declarant also
stated that the shooting was wilful and malicious. The ap-
pellant's attorneys admit there are authorities to the effect
that testimony that the deceased was shot "for nothing," is
admissible as a dying declaration, and cite the case of *Boyle*
v. *State,* 105 Ind., 469; s. c., 55 Am. Rep., 218, in which the
Court uses this language: "The declaration does not assume
to be the expression of an opinion, but it professes to be, and
in truth is, a statement of fact; for if there is no reason or
cause whatever, no opinion could be given for its sufficiency
or insufficiency. Whether there is any cause for an act,
must be a fact; but if it be conceded that there is a cause, then
whether it was or was not adequate, might well be deemed
matter of opinion." The Court further says: "There is an
essential difference between a statement denying a thing and
one admitting the existence of a thing, and qualifying its
character. Thus to declare that liquor was sold, but not ille-
gally, or that a man was struck, but not unlawfully, would,
so far as the qualifying words are concerned, be a conclu-
sion; if, however, these words should be struck out, facts
only would remain." The words, he shot me "for nothing,"
are not merely the expression of an opinion, but the state-
ment of a fact, and there was no error in admitting such tes-
timony. There is another reason why not only this declara-
tion, but testimony that he was shot wilfully and maliciously,
was admissible in evidence. In the case of *Jones* v. *Fuller,*

19 S. C., 70, the rule is thus stated : "From these authorities we deduce the following conclusions : *First.* That the exceptions to the general rule that the opinion of witnesses are not competent evidence, is not confined to the case of expert testimony. *Second.* That while it is necessary that the witness should first state the facts upon which he bases his opinion, where the facts are such as are capable of being produced in language, it is not necessary to do so, where the facts are not capable of reproduction in such a way as to bring before the mind of the jury the condition of things upon which the witness bases his opinion. *Third.* That such evidence is competent from the necessity of the case." Although the deceased did not state the facts and circumstances that induced him to believe that the shooting was wilful and malicious, nevertheless there was testimony tending to show facts and circumstances within his knowledge, upon which his opinion might have been based. Under such circumstances, the testimony was properly submitted for the consideration of the jury.

The next question to be disposed of is whether there was error in the preliminary charge. The only error assigned is that the presiding Judge failed to charge certain propositions of law mentioned in the exceptions. These propositions were afterwards charged, and even if there was error in the first instance, it was thereafter remedied.

The next question that will be considered is whether the presiding Judge committed error of law in charging on the facts. The exceptions raising this question are too general; but waiving this objection, they cannot be sustained, as we fail to discover wherein the defendant was prejudiced. Under the head of "alleged errors of law in final charge," the appellant's attorneys argue as follows : "In his final charge the Circuit Judge made the guilt or innocence of the accused to depend upon a preponderance of the testimony as to a special defense. Notably, he said to the jury, 'I charge you that the defendant in this case is

not to be acquitted on the ground of accidental homicide unless he has satisfied you by the greater weight of the testimony that he is entitled to be excused and go unpunished.' And again in charging, 'If, however, you are not satisfied by the preponderance of the evidence that the homicide was such an accidental homicide as should not be excused, but that it was an accidental homicide which should be punished as involuntary manslaughter (I think you will remember what I explained to you in this connection), you will say guilty of involuntary manslaughter;' thus instructing that · unless the jury was satisfied that the homicide was excusable because accidental, conviction followed." These words should be considered in connection with the other parts of the charge, and when so construed we are satisfied that there was no prejudicial error. They also say in their argument: "Again, his Honor clearly erred in charging, 'Or, if after the definitions I have given you, you come to the conclusion that even if an accidental homicide, it was such an accidental homicide as takes place when a defendant is doing an unlawful or felonious act, you will in that case have to find him guilty of murder;' because, even if the homicide was committed while the defendant was in pursuance of an unlawful act not felonious, the jury could at most only find him guilty of manslaughter." The presiding Judge substantially charged the law applicable to the case, and if the appellant's attorneys desired a more specific charge, requests to that effect should have been presented. They say likewise: "His Honor governed the jury with respect to the amount of care, caution and prudence that the defendant should have exercised as would be required in a civil case, and failed to charge them as to what was criminal carelessness. At the same time, making the jury sole judges of both the facts and the law on this subject." As has just been stated, the presiding Judge charged the law substantially, and if a more specific charge was desired, requests should have been presented.

The appellant contends that there was error in admitting evidence of other disputes and quarrels in which the defend-

ant used threats against the deceased.    In the case of *State v. Campbell,* 35 S. C., 32, the Court says : "We are not aware of any rule of law which fixes any definite time, within which a threat must be made, before the perpetration of the act, to which it is supposed to refer, in order to render testimony as to the making of the threat competent evidence.    Of course, where a great or even a considerable length of time has elapsed between the making of the threat and the perpetration of the deed to which it is supposed to point, such length of time is a circumstance to be considered by the jury in determining whether there is any connection between the threat and the deed; but there is no rule of law, and, in the nature of things, it would be practically impossible, to prescribe any rule fixing the limit beyond which a threat would not be competent evidence." The testimony was, therefore, admissible.

The appellant, lastly, contends that there was error on the part of the Circuit Judge in intimating his opinion on the facts during the progress·of the case; but we fail to discover any error in this respect necessitating a reversal of the sentence.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.