STATE v. HEAD.

1. EVIDENCE—DYING DECLARATIONS.—The evidence shows that death
   of deceased was imminent when he made the declarations, and they
   were properly admitted as dying declarations.
2. NEW TRIAL.—Held to be no abuse of discretion to refuse new trial
   because witness giving dying declarations of deceased, stated, after
   testifying, other things than those testified to as said by deceased
   at same time.

Before WATTS, J., Pickens, March, 1900. Affirmed.

Indictment against Wesley Head for murder of Joseph
Kelly. The motion for new trial was rested mainly on the
affidavit of several persons, who say on oath that after the
trial they heard Dr. Kirksey say that after the statement was
taken, "he said to Kelly he ought to tell the truth about the
matter, for he had a long term ahead of him to serve in that

other country, and that said Kelly told him he did strike Head a hard lick and followed him about ten steps, striking at him, and that if he had been Head he would have done what he did, and that if he had got to him he would never have lived to shoot anybody."

From verdict of "guilty of manslaughter and recommend that mercy be shown to fullest extent," and sentence thereon, the defendant appeals.

*Messrs. Morgan & Blassingame,* for appellant, cite: *As to requisites of dying declarations:* 10 Ency., 2 ed., 364; 58 S. C., 352; 34 S. C., 139. *As defining abuse of discretion:* 47 S. C., 488; 74 Wis., 18; 26 Wend., 152.

*Assistant Attorney General U. X. Gunter,* contra. Oral argument.

June 4, 1901. The opinion of the Court was delivered by

MR. JUSTICE GARY. The appellant was convicted of manslaughter, and appealed from the sentence of the Court on the following exceptions:

"1. His Honor erred in permitting the witness, Dr. Robert Kirksey, to testify to alleged dying declarations of the deceased, there being no sufficient evidence to show that at the time of the making of them the declarant was in *extremis,* and fully conscious of his impending dissolution.

"2. His Honor erred in admitting in evidence the alleged dying declaration of the deceased, there being nothing to show more than that he believed he was about to die, and nothing to show that he was in *extremis;* but even if so, nothing to show, in addition thereto, that they were made under a sense of impending death, both of which conditions, we submit, are necessary.

"3. His Honor erred in admitting in evidence the written statement, purporting to be dying declaration of deceased, when the witness, Dr. Kirksey, had detailed an alleged statement made to him by the deceased at 11 o'clock on the night

previous, and by his testimony showed that the statement admitted in evidence was written twelve hours after the detailed conversation of the day before, and that it is shown from the witness that the deceased said 'about the same thing' on the day the statement was written. Nothing, therefore, to show what was the sense and condition of the deceased at the time the statement was written—whether in *extremis,* and further, whether under a sense of immediate dissolution—both of which conditions, we submit, were necessary to make competent the written statement.

"4. His Honor erred in admitting the written statement purporting to be the dying declaration of the deceased, because such statement does not show the deceased to be in *extremis,* nor does it contain a word or syllable as to the death of the deceased—proximate or remote—thereby falling short of the third requirement for admission as such testimony.

"5. His Honor abused his discretion in refusing to grant the defendant a new trial upon the motion and affidavits submitted therein, in that testimony as given by Dr. Kirksey shows him to have been hostile towards the defendant, and when viewed in the light of the affidavits, is wholly at variance with what he testified to as being the whole of the dying declarations of the deceased. That having admitted in his testimony that the written statement was *all* that the deceased said with reference to the difficulty, it was, in the subsequent light of the character of such witness, the duty of the Circuit Judge to have granted a new trial, because it was then apparent to him that such important testimony, always having great weight with a jury, was incomplete, unfair, and wholly at variance with the true facts of the difficulty as detailed by said Dr. Robert Kirksey as being dying declarations of the deceased; and while there is nothing to show that the verdict of the jury would have been different, it is a fact that the testimony of the defendant is corroborated by the statement of the witness, Dr. Kirksey, set forth in the affidavits."

Dr. Kirksey testified as follows: "Q. Where do you live? A. Pickens County. Q. Were you called upon to make a post mortem examination upon the person of Joe Kelly? A. Yes, sir; I saw him before and after his death. Q. Tell all about it? A. On the 16th of December, 1899, at 8 o'clock at night, I was called to see Joe Kelly, and I found him at his house, about eighteen miles from here, and about eight miles from my house. He lives near Keowee River, and he had a shot-gun wound, and he was under a great shock from the wound he had received. Q. Where was the wound? A. It was on the body here, about four inches from the hip bone and about six inches from the median line here (indicating), and it ranged back here and struck the back bone. Q. Did it come out back there? A. No, sir. Q. Was there any other wound about the person? A. No, sir. Q. How long did he live? A. Thirty hours. Q. What caused his death? A. That gun-shot wound. Q. Did you know anything of the facts of the case? A. Not until just before he died; a while before. Q. What did he say about his dying? A. He asked me did I have any hopes of him, and I told him that as long as there was life there was hope. Q. Did he express anything else than that? A. He said that he was going to die, and that he would like to make a statement to me before he died with reference to the difficulty, and he said that he would like to get a preacher there before he died, and if I saw one to be sure to send him to him, and that he was going to die, and that he was not going to be long about dying. Q. Did he say anything about— Mr. Morgan objects to leading the witness. By the Court: How long was that statement made before he died? A. That statement was made that night about 11 o'clock, and the next morning about 11 o'clock he said about the same thing. He just said that he was going to die, and that there was not worth while for me to hold out any hopes for him; that he knew the condition of his wound, and that he knew that he was going to die; and I told him that as long as there was life there was hope; and he said that there was no hope for him, and I ought not to

hold out hopes to him. By the Court: When did he make that statement? A. He made that statement that night about 11 o'clock, and the next morning about 11 o'clock he said the same thing. The Court: I think that is sufficient to let the statement in. Mr. Morgan objects on the ground that the death of the deceased must be shown to be imminent at the time of the making of the statement. Objection overruled. Mr. Morgan excepts. Q. What did he say about the difficulty? A. I wrote down exactly what he said to me, and I will just read it to you: '17th December, 1899, Sunday, I had been to Pickens, and in coming back met some one; drove close up to them before I saw them. I called out, who are you, and got out, went out to where they was, and found it to be Wesley Head. I asked him why he did not tell me his name; he answered, it was none of my God damn business, and shot me as he finished speaking. He then got in his buggy with Marcus Ellenburg and drove off. My aunt, Dock Kelly, Oscar Galloway. He was out of the buggy when I got to the front of the team.' Cross-examined by Mr. Morgan: Q. Whose handwriting is that? A. J. K. Kirksey's. Q. I thought you said you wrote it down? A. My father wrote it right down while I was there, and I saw him write it. I was looking over his shoulder and saw him write it. Q. Who else was in the room? A. His father and, I think, two women. Q. What time was it? A. As well as I remember, it was about 11 o'clock on Sunday. Q. And he died when? A. About 1 o'clock the same night. Q. About fourteen hours after he made the statement he died? A. Yes, sir; I would have wrote that myself, but I had on my overcoat and could not well."

The appellant's attorneys interposed only two objections to the foregoing testimony: 1st. To leading the witness, and 2d, "on the ground that the death of the deceased must be shown to be imminent at the time of the making of the statement." All other objections that might have been urged against the admissibility of the testimony were waived.

The foregoing testimony shows that the death of the de-

ceased was imminent at the time said statement was made, and what we have said shows that the first, second, third and fourth exceptions must be overruled. We will next consider the fifth exception. When Dr. Kirksey was on the stand as a witness, the appellant's attorneys had the opportunity of cross-examining him fully as to the facts of the case, and we fail to discover any abuse of discretion on the part of his Honor, the presiding Judge, in refusing the motion for a new trial.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.