## 9284

### STATE v. THOMAS.

#### (88 S. E. 20.)

CRIMINAL LAW. HOMICIDE. APPEAL AND ERROR. EVIDENCE. THREATS. RES GESTAE. DYING DECLARATIONS. CHARGE. SELF-DEFENSE.

1. CRIMINAL LAW—APPEAL AND ERROR.—A defendant cannot complain that a judgment was more favorable to him than the law required.

2. HOMICIDE — THREATS — EVIDENCE. — (*Dicta*) Statements of deceased showing his state of mind when the affray occurred made shortly thereafter might have been held admissible in evidence, if called to the attention of the trial Court.

3. HOMICIDE—EVIDENCE—RES GESTAE.—The admissibility of statements as part of the *res gestæ* is to be determined by the trial Court in the exercise of its discretion.

4. HOMICIDE—EVIDENCE—DYING DECLARATIONS.—Where it is not shown that statements were made by deceased in immediate apprehension of impending death, they are not admissible as dying declarations against his accused murderer.

5. HOMICIDE — DEFENSES — SELF-DEFENSE — ESCAPE. — One accused of homicide need not satisfy the jury that he had no way of escape except to kill deceased, but only that no other way of escape would have appeared to a man of ordinary prudence and firmness.

Before GARY, J., Abbeville, September, 1915. Reversed.

Charles B. Thomas, convicted of manslaughter, appeals.

The following statement of facts appears in the case:

"The indictment charged the defendant with the murder of one R. C. Fields. It is alleged that homicide was committed with a pistol. There was a second count in the indictment, charging the defendant with carrying a concealed weapon about his person, to wit, a pistol. Upon the trial of the case the testimony showed that the defendant and the deceased had had a quarrel the day before the homicide, and that deceased had threatened the defendant, saying that if he caught him off of his premises that he would get him. On the day of the homicide the defendant was in his field, where some of his hands were at work.

The deceased was seen approaching with a double-barreled breech-loading shotgun, cocked and in a position to shoot. When defendant saw the deceased he called to the man he was talking to, and who was working for him, J. R. Woodhurst, and told him that Fields was coming to shoot him. The defendant got behind Woodhurst and Woodhurst begged the deceased not to shoot Thomas. Deceased continued to advance, telling Woodhurst to get out of the way, that he was going to shoot. When Fields got near Woodhurst, the latter jumped at him, caught hold of the gun, and endeavored to get it out of Fields' hands. At the same time he told Thomas to run. Thomas started to run, when the deceased threw Woodhurst to one side, and shot both barrels at Thomas, striking him in the head. He then reloaded the gun and fired another shot at Thomas, who was still running. The last shot struck Thomas in the legs. Thomas then turned towards Fields, who also turned and started to run. Thomas fired six shots at him out of a magazine pistol, two of which took effect, and one of them caused his death a day or two afterwards. Thomas testified that he thought Fields had turned to reload his gun, and that he fired in defense of his own life."

The defendant put up a witness who said that he went to the house of the deceased about three-quarters of an hour after the shooting, and was asked this question: "In answer to your question, as to why he had a gun in the field, did he go on and explain about the matter. Tell how it happened?" The answer to this question was ruled out. In reply the State offered and proved a dying declaration as follows:

"After the close of all the testimony for the defendant, the Solicitor offered as a witness Rev. S. O. Cantey, who testified as follows: Q. Did you see him (Fields) after he was shot and before he died? A. Yes. Q. How long before he died? A. I left him at 3:30. Q. When did he die? A. I heard about seven o'clock. Q. Have any con-

versation about this trouble? Defendant's attorney objected on the ground that it was not in reply to anything brought out in the defense, was not a part of the *res gestæ*, and not a dying declaration.   The objection was overruled, and the witness then said: Q. Did he say anything to you about dying?   A. Yes, I heard that he was going to die, so I took the next train to see him; went to see Dr. Neill; he said he was in a weak—and the conversation was very unsatisfactory—I asked him about his faith; he said it was all right.   I asked him how he managed to get in such trouble; said he could not help it, it was forced on him, and said he only wanted peace; he could speak only three or four words at a time; he was very weak.   Said he only wanted peace, but could not avoid it."

The verdict of the jury was, "We find the defendant guilty of manslaughter."

*Mr. Wm. N. Graydon,* for appellant, cites: *As to failure to instruct as to count for concealed weapons:* Crim. Code, secs. 159, 160; 68 S. C. 318; 69 S. C. 454; 70 S. C. 384; 76 S. C. 105.   *As to evidence showing deceased's state of mind:* 16 Cyc. 1131, 1152, 1180; 134 Mass. 252; 45 Am. Rep. 322. *Res gestæ:* 13 S. C. 459; 47 S. C. 9.   *Dying declarations:* 100 S. C. 48.   *Self-defense:* 29 S. C. 44, 236; 66 S. C. 473.

*Mr. Solicitor Cooper,* for respondent.

February 29, 1916.

After reciting the foregoing statement of facts, the opinion of the Court was delivered by Mr. Justice Fraser.

The appellant's first question is:

"The first three exceptions raised the point that the indictment in the case, having charged the defendant with carrying concealed weapons, it was the duty of the Court to have charged the jury to find a special verdict on said count and it was the duty of the jury to

find such special verdict, and that the Judge was without power to render judgment on the verdict, unless it conformed with sections 159 and 160 of the Criminal Code of this State."

This question is settled by *The State* v. *Hasty,* 76 S. C. 114, 56 S. E. 669.

"If the Solicitor had the right in that case, to enter a *nol. pros.* as to the count for carrying concealed weapons, when he was satisfied that it was not sustained by the testimony, he had a right, in the case under consideration, to omit the count for carrying concealed weapons, upon being satisfied, in the first instance, that it would not be sustained by the testimony, especially when it might well have been contended that the accused was on his own premises, at the time of the homicide."

In this case there was an appropriate allegation and no *nol. pros.*

The defendant was on his own land. The verdict acquitted the appellant of the charge of carrying concealed weapons, and he cannot complain if the judgment was more favorable to him than the law required.

The next question is, was it error to exclude the testimony of defendant's witness as to the shooting soon after it occurred.

Appellant stated "our object here was to show the state of mind that Fields (the deceased) was in when he went to look for Thomas with a double-barreled shotgun." The case does not show that this ground was stated in the trial Court. The statement of the Judge shows clearly that he understood the evidence to be offered as a part of the *res gestæ,* and excluded it on that ground.

Statements of deceased, made before a homicide, containing threats, even uncommunicated threats, can be admitted on behalf of the slayer, and it is different to see why statements made after the affray are not equally admis-

sible. If this ground had been stated the testimony would probably have been admitted.

3    The next question is as to the admissibility of the statements as a part of the *res gestæ.* ·That was largely in the discretion of the trial Judge, and it does not appear that he abused his discretion.

4    The next question is as to the admissibility of the testimony as to dying declarations.

There was error here. The rule in this State is well set forth in *The State* v. *Belcher,* 13 S. C. 462.

"They are only admissible from the necessity of the case, and when made *in extremis*—when the party is at the point of death and is conscious of it—when every hope of this world is gone and every motive to falsehood is silenced by the most powerful considerations to speak the truth.".

The deceased and the witness talked about death, but men may talk about death who do not think they are about to die. The record does not show that the deceased even thought that he was going to die. This exception is sustained.

The last question is, was it error to charge:

"If he had satisfied you that at the time he struck the fatal blow he was in danger of receiving serious bodily harm, or losing his own life, or the appearance were such, he

5    must go a step further. He must show you that a person of ordinary reason and prudence would have come to that same conclusion, would have come to the conclusion that at the time he struck the fatal blow he was in danger of receiving serious bodily harm or losing his own life, or the appearances were such to justify it. He must go a step further. He must satisfy you that he had no other means of escape, except to strike the fatal blow. The law does not permit one to take the life of one lightly, the law says avoid taking human life if you can, and if he had other means of escape except to strike the fatal blow he must avail himself of it. Has he satisfied you that he had no other

means of escape; if so, and he has satisfied you on all these other propositions he has made good his plea of self-defense; if he has failed to satisfy you on any of these, his defense falls to the ground."

This may have misled the jury. It may have produced the impression that a way of escape, whether apparent to a man of ordinary prudence and firmness or not would destroy the defense. This exception is sustained.

The judgment is reversed and a new trial ordered.

MR. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS and GAGE concur in the opinion of the Court, and MR. JUSTICE HYDRICK concurs in the result.