## 10121

### STATE v. BURTON.

#### (98 S. E. 856.)

1. CRIMINAL LAW—HARMLESS ERROR—COMPETENCY OF JURORS—PRIOR SERVICE AS JUROR.—In a prosecution for homicide, presentment by the Court of a juror, who had sat on the coroner's jury at the inquest though error, was not prejudicial, where the defendant rejected the juror by peremptory challenge and did not exhaust his peremptory challenges.

2. CRIMINAL LAW—EXPERT EVIDENCE—MATTER IN ISSUE.—In a prosecution for homicide, testimony of a physician, who attended deceased after he received his mortal wound, that the deceased knew and realized that he could not live, *held* not inadmissible on the ground that it was a mere opinion upon the material question as to the admissibility of the deceased's statement as a dying declaration.

3. HOMICIDE—DYING DECLARATIONS—SOLICITATIONS.—The fact that a physician told deceased that he could not live and that, if he had any statement concerning anything he wanted to come out in his case, to make it to him, would not render inadmissible the statements of deceased.

4. HOMICIDE—EVIDENCE—DYING DECLARATIONS—COMPETENCY TO SHOW "IN EXTREMIS."—The testimony of a physician who attended deceased after he received his mortal wound to the effect that he told deceased that he could not live, that deceased stated he realized such fact and that it was hard to die, was competent to show that deceased was "in extremis."

5. CRIMINAL LAW — STATEMENT BY PERSON INJURED — RES GESTAE.—In prosecution for homicide, testimony by witnesses as to statements made by deceased to them shortly after the shooting *held* admissible as part of the *res gestae*.

6. CRIMINAL LAW—ADMISSION OF EVIDENCE IN REPLY—DISCRETION OF COURT.—In prosecution for homicide, the court *held* to have not abused its discretion in allowing the State to introduce evidence in reply.

7. CRIMINAL LAW—TRIAL—INSTRUCTIONS AS TO A WHOLE.—The Court's charge to the jury in a prosecution for homicide, taken in its entirety, *held* not to show any error prejudical to defendant.

Before PEURIFOY, J., Newberry, Fall term, 1916. Affirmed.

Ira O. Burton was convicted of manslaughter, and he appeals.

The following proceedings were had at the trial:

During the selection of the jury the defendant made nine objections peremptorily.

Juror No. 17, sworn, says:

"I am not related by blood or marriage to the defendant. I haven't formed or expressed an opinion as to the guilt or innocence, except I was a member of the coroner's jury. I am not conscious of any bias either for or against him. I know of no reason why I should not bring a true verdict according to the law and the testimony.

"By Mr. Timmerman: The coroner's jury only arrived at the facts as to how the deceased came to his death. Yes; I made up my mind as to how the deceased came to his death. Q. You didn't make up your mind as to anything else? A. No, sir. Q. How do you separate it? How could you separate it from the other testimony?

"By the Court: I don't think a juror has to go into all that.

"By Mr. Timmerman: Your Honor please, we except to this juror. He has some knowledge of the case, and must have formed some opinion, having heard the testimony at the coroner's inquest. He has listened to that investigation, and we except to him. We want to examine the juror further, and we except to the ruling of your Honor in stopping the examination. The Court: I didn't stop the examination. I merely held that I didn't think the juror had to go into and explain how he differentiated between whether or not he passed upon the facts or the cause of his death. By Mr. Timmerman: May I ask another question? The Court: Yes, sir."

Examined by Mr. Timmerman, juror stated: "I don't remember how many eyewitnesses were examined, but several, I expect a half dozen or more. Those witnesses went into details and told about the transaction. The members of the jury inquired as to the details of the killing. Mr. Timmerman: I would like to make reference to the coroner's inquest. Mr. Cromer: We suggest that that couldn't

be presented before the jury.  Mr. Timmerman: Certainly not.  I want to present it to your Honor.  Witness: Having heard examination at the coroner's inquest, I am prepared mentally to give the defendant a fair trial.  I only remember the testimony submitted in a general way.  I feel that I could give him a fair trial.  I am not conscious of any bias either for or against him."  (Presented and rejected by defendant.)

Testimony for the State:

Dr. J. K. Gilder, sworn, says: "I reside in Newberry.  I am a practicing physician.  I knew David A. Langford, and have known him since he was a boy.  I was called to see him about the 29th of January, this last year.  I found him in my drug store and examined him.  I found a gunshot wound.  I didn't make a thorough examination until I carried him to Columbia on the evening train.  I made a thorough examination there.  He was operated on.  We found a pistol wound.  It entered the left side, and it penetrated the pancreas and cut the intestine and ranged toward the back.  I stayed with him all the time he was in the hospital, except one or two occasions I came to Newberry.  The shooting occurred Saturday evening, and he died the following Thursday evening about 8 or 9 o'clock.  The bullet entered the left side and ranged back toward the spinal column.  We didn't find the bullet that night.  He died in Columbia.  The wound caused his death.  I talked with him the evening before he died and also about 11 o'clock on Thursday before he died.  Thursday morning I told him that he couldn't live, and that, if he had any statement to make, to make it to me, anything that he wanted to come out in his case.  He said that it was hard to die that way; that there was no cause— * * * He said that he would like to see his son before he died, who was in Newberry; his wife was at the hospital.  I told him he couldn't live; he knew he couldn't live; he realized he couldn't live.  After he said

that it was hard to die that way, and that he wanted to see his son, he made a statement to this effect— * * *

"The Court: Let me ask him a question. You say that you advised him that he couldn't live? A. Yes, sir. Q. Do you or not know whether he realized his condition? A. Yes, sir; he realized his condition. * * * Mr. Cooper: Q. Just state what he said to you, doctor, about dying. A When he stated to me that he would like to see his son before he died, it wasn't with any intention to bring the boy to Columbia. Mr. Timmerman: We object to that as a mere opinion and move to strike it out. The Court: He can state whether or not any arrangements were made, if he knows, to bring the child to Columbia. Mr. Cooper: What about that? A. None were made. He did not suggest any. I think most of his family was in Columbia at the time. He did not subsequently to that express any hope of getting well. He sank from that time on. * * *"

W. S. Langford, sworn, says: "I am a brother of the deceased. He was younger than I. (Witness identified clothes of the deceased and the same were offered in evidence.) I was coming from towards the opera house across the street where there is a pinder parcher and a billboard when my brother was shot. When I heard the shot I thought it was an automobile tire or something, and I looked around and saw a man brandishing a pistol. When I got closer I saw it was Burton. I saw my brother on the sidewalk. I went to him as quick as I could. Don't know whether I trotted, ran, or walked. He was standing up with his hands to his side (indicating). When I got near to him his hands kind of dropped, and I realized he was shot. I asked him, 'What's the matter?' * * * The Court: Where was the defendant at that time? A. Out on the street. The Court: How far from you? A. I guess he was as far from here as to Mr. Timmerman. My brother was about the middle of the sidewalk. Q. Had your brother moved from the place where he was shot? A. I don't know. When the

crowd opened up, I saw him, and then I ran to him.   As
soon as I saw him I got to him pretty quick.   I went pretty
quick—a minute or two I suppose.   As soon as I got to him
he made a statement. * * * I came up to him and said,
'What is the matter, Dave?'   He said, 'Ira Burton shot me
in the stomach for nothing.' * * * He said, 'I want you to
take care of Lil and Bluford.'   That indicated that he was
going to die.   I says, 'All right; I will get you to the doctor;
maybe you are not wounded much.'   I took him by the arm,
and he said, 'I can walk,' and we walked up the street.   Mr.
Burton was still there, and I asked him if he had a gun.   He
said that he did not.   I heard some talk, but I didn't catch
what it was.   I took my brother to the drug store.   Just
as we started off Mr. Reighly came up and took his right
arm.   I had his left.   It was bleeding.   I think the cuff
button cut his arm.   He began to weaken as he went across
the street to the drug store.   My brother did not have any
weapon of any kind except that he may have had a pocket-
knife.   On the way to the dug store I saw Hayne Abrams.
He joined us.   I remember seeing Frank Hunter. * * *"

Dr. W. G. Houseal, sworn, says: "I am a practicing
physician.   I live in Newberry.   I saw Langford the day
that he was shot a few minutes after he was shot in the drug
store.   I heard him make a statement.   I heard him tell his
brother that he knew he had a pistol wound, and that he
couldn't live, and that he wanted him to take care of his
wife and child.   Q. After he said that about dying, did he
make any statement as to how the matter happened? * * *
A. He also stated to his brother that his business was in good
shape; that he had a certain amount of life insurance, men-
tioning the amount.   I said, 'Dave, how did this happen?'
He said he came in contact with Burton on the street, and he
said Burton, 'I understand that you have been circulating
reports about me, that I have been keeping Mayme Harp,'
and asked Burton if he had said so.   He said Burton said,
'Yes,' and he called Burton a lie, and Burton called him a

'dam lie' and that he had struck Burton, and Burton pulled
out a pistol and shot him. He said he had no idea that
Burton would shoot him and that he was taken by surprise.
He didn't say anything about whether or not he was armed.
* * *"

Judge's charge: "Mr. Foreman and gentlemen of the
jury, I commend you upon the very patient and careful
hearing that you have given the witnesses and also the attor-
neys in the trial of this case. I have been impressed with
your apparent desire to know the truth and your earnest
desire to reach a true verdict. I shall ask your indulgence
for a moment while I shall give you what I conceive to be
the law applicable to the case. You have been sworn to try
this case according to the law and the testimony, and I wish
to admonish you in the beginning that it is as much your
duty to try it according to the law as it is to try it according
to the testimony. You are not responsible for the testimony
that has been given you by the witnesses; equally you are not
responsible for the law. That has come down to us through
ages, and I have no more right to make the law in this or any
other case than you have to make the law. So you will try
this case under the law and under the testimony, and you
have approached the case with that condition of mind. You
are not related either by blood or marriage to either party,
you have not formed any opinion or expressed it as to the
guilt or innocence of the accused, and you are not conscious
of any bias either for him or against him, and you do not
know of any reason whatever why you should not bring in a
true verdict according to the law and the testimony. So
that you approach the deliberation of this case with a clear
mind and a clean heart, prepared to vindicate the law and
try the case under the law.

"Now, the defendant at the bar, Ira O. Burton, is charged
with one of the most serious crimes known to the law. He
is charged with murder. The allegation is that on the 29th
of January, 1916, in the town of Newberry, that he shot one

David A. Langford with a pistol and wounded him, and
from that wound he died in a hospital in Columbia on Feb-
ruary 4th, and that the circumstances surrounding the shoot-
ing were such as to make out the crime of murder, and,
therefore, the allegation is that it was done wilfully, mali-
ciously, feloniously, and with malice aforethought. He is
also indicted for at the same time carrying a concealed
weapon about his person, against the statutes of this State.

"Now, Mr. Foreman and gentlemen of the jury, murder
is the killing of any person with malice aforethought, either
expressed or implied. Murder is the killing of any person
with malice aforethought, either expressed or implied. So
that the first inquiry that you will make is whether or not
the person is dead. That question is not disputed. The
next question is, 'Who killed him?' and, finding out who
killed him, your next inquiry will be, 'Under what circum-
stances did he kill him?'

"Human life is sacrificed. Mankind has been able to
invent many wonderful things and do many wonderful
things, but science has never yet been able to bring back a
life that has been shut out. When once the spark has been
put out, mankind has been helpless in all ages of the past to
bring back or revivify man, and, therefore, when any one
takes human life, the law places upon that act a fearful
penalty, unless it is done under certain circumstances. In
olden times, before organized society existed, when a man
was killed it was the duty of his nearest relative to seek out
and take the life of the man who killed him, and he was
called the 'Avenger of Blood,' but in the time of Joshua
cities of refuge were made where, if a man killed another
by mischance or accident, he might flee to that city and
escape the hand of the Avenger of Blood, and that was the
first step towards organized Courts. That was the first
step, Mr. Foreman and gentlemen of the jury, because many
times the Avenger of Blood would kill a man who had the
right to take the life of another, and, therefore, he could flee

to the city and there be tried at the gate of a Court, and if he was found innocent, he could remain in the city, but that was in the case of an accident. Later on the human race began to slowly improve and develop, and it was known that many cases that were not accidents, yet in which the person in the exercise of the right of self-defense would take the life of another, when he ought not to be slain by the hand of the Avenger of Blood, and this we have in our Courts today, the second step; that any one who takes life in self-defense will not be punished by the Avenger of Blood.

"So, Mr. Foreman and gentlemen of the jury, you will investigate in this case and see whether or not the defendant took the life of the deceased, and he admits that he did. Under what circumstances did he take it? If he took it under such circumstances, Mr. Foreman and gentlemen of the jury, which would indicate a wilful intention to take human life and without legal justification or excuse, as I shall charge you, he would be guilty of murder, and, as I charged you, murder is the killing of a human being with malice aforethought, either expressed or implied. So that you will observe that the first element in the definition is malice and malice is that condition of heart—that condition of mind which shows a heart regardless of social duty and fatally bent on mischief. It is the intentional doing of any unlawful act against another without justification or excuse. Malice is synonymous with the criminal intent. Now this malice must exist in the mind of the party who takes human life before and at the time of the act of taking human life; its existence may be expressed or implied. Now, express malice is where any one declares or manifests a positive intention to commit a crime. If you, Mr. Foreman, should say that 'I intend to shoot a man' and proceed to shoot him, your declaration would be express malice. Now, implied malice is inferred from the facts and circumstances proved, because a man is presumed to intend the consequences of his voluntary acts. It may be implied in a number of ways; the

kind of weapon used, lying in wait, preparation, deliberation, any number of ways that you may infer that malice exists. I charge you that, where it is shown that a person kills another without anything more the law implies malice or presumes malice without anything else, but, when all the facts and circumstances are proven, then the State must show that malice existed beyond a reasonable doubt.

"So, Mr. Foreman and gentlemen of the jury, your first inquiry will be whether or not the defendant killed the deceased with malice aforethought, either expressed or implied. · If he did do it without justification or legal excuse, then he is guilty of murder. But, if you should find, Mr. Foreman and gentlemen of the jury, that he did take the life of the deceased, but that he did it under such circumstances of provocation or legal excuse that would tend to dethrone reason and arouse anger, and cause him to strike or shoot under the impulse of that anger, then the killing would not be lawful, but it would be reduced from murder to manslaughter, and manslaughter is the killing of a human being without malice. So you will see the difference in that. In murder the malice must exist; in manslaughter there is an absence of malice. Manslaughter is usually defined as the taking of human life in sudden heat and passion and upon sufficient legal provocation, but even, Mr. Foreman and gentlemen of the jury, where there is provocation, there is no right to kill, unless the circumstances are such as to justify the person in making the assault to believe that he had to act in self-defense, and I shall charge you on that. So, Mr. Foreman and gentlemen of the jury, from the testi mony which you have heard it is your duty to determine that testimony, the weight of it, and the value of it, and the credibility to be given to each witness, and in reaching your conclusions you will exercise your good judgment, your knowledge of human nature, and in reaching this you will determine whether or not he shot the deceased with malice or without malice.

"Now, Mr. Foreman and gentlemen of the jury, you should consider further his plea of self-defense. Where a person kills another and admits the killing and comes into Court, the law presumes, as I have stated before, that he intended his act and will hold him responsible for his act, but in this case the defendant contends that, while he did kill the deceased, yet he alleges that he did it in defense of his own life and his own person; so it becomes necessary for me to charge you as to the law of self-defense. Now, Mr. Foreman, that is a good defense if it is made out. The right to defend one's life and one's person is a God-given right. It is not only common to man, but it is common to every creature. The law of self-preservation is said to be the first law of nature, and the law recognizes the right, and if a person in the exercise of that right kills his assailant, the law excuses him, but in order to make good this place, Mr. Foreman and gentlemen of the jury, the burden is on the defendant to prove to your satisfaction by the greater weight of the evidence certain things. Self-defense is based upon necessity, and I charge you in the beginning that human life is so sacred, human life is so sweet, that no man has the right to assault or take human life except that it is necessary to save himself from death or serious bodily harm; so that the whole defense, Mr. Foreman and gentlemen of the jury, may be condensed into the one word 'necessity.' If it was not necessary, and the other elements of self-defense were present, it is excusable, but it must be necessary, and in order to make out the plea the person setting up the plea must prove by the greater weight of the evidence, first, that he was at fault in bringing on the difficulty, and that is a reasonable rule. It complies with good common sense and justice, because why should a man bring on a difficulty and then, being placed in that difficulty that he brought on himself, it becomes necessary for him to take the life of the person, for him to come into Court and say he had to kill in order to save his own life. So a person must be without

fault in bringing on the difficulty; he must come into Court with clean hands; and if he should fail to prove to your satisfaction that he was without fault in bringing on the difficulty, then his plea of self-defense fails. Then next is that it was necessary, not only must he be without fault in bringing on the trouble, but it must be necessary for him to take the life of the deceased in order to save himself from death or serious bodily harm. Not only that, but he must believe that he was in danger of suffering death or serious bodily harm, and that a man of ordinary reason and firmness would have believed the same thing placed as he was placed. I say it is not only necessary that he must believe that he was in danger of suffering death or serious bodily harm, but a man of ordinary firmness and reason must believe the same thing under the same circumstances. The standard is the man of ordinary reason and firmness. Some men might think they were in danger when they were not, and others might think they were not in danger when they really were. Some men are more courageous than others; some are more timid. So the best the law can do is to take the man of ordinary reason and courage. And then he must prove the additional factor that there was no other reasonably safe means of escape. Even he was without fault, even it was necessary or appeared to be necessary, if there is a reasonably safe means to avoid taking human life, the law imposes upon him to avail himself of that opportunity.

"Of course, Mr. Foreman and gentlemen of the jury, a man wouldn't be required to run if by running he would more greatly endanger himself, and I charge you further, Mr. Foreman and gentlemen of the jury, that a man does not have to wait until his antagonist strikes before exercising the fatal blow if he believes he is in danger, and that he was not at fault in bringing on the difficulty, and that a man of ordinary reason and firmness would have believed the same thing placed as the defendant was placed. A man has the right to act upon appearances, provided a man is suffer-

ing death or serious bodily harm, and he would not have to wait until he was struck the fatal blow or until he would have been shot before acting. Mr. Foreman and gentlemen of the jury, I charge you further that no words, however opprobrious, are sufficient to justify an assault. You have no right to strike a man because he insults you, because he calls you a lie, or because he calls you anything else. No words will justify an assault. I charge you further that a man cannot insult another and bring on a difficult by insulting words or epithets, and then, after bringing on the difficulty, should he take the life of his assailant, he could not plead self-defense. As I charged you under the general law, he must be without fault in bringing on the difficulty, and if a man should apply opprobrious language to another and bring on a difficulty, and in that difficulty which he brought on himself it becomes necessary for him to take the life of the other, he could not plead self-defense successfully. He must be without fault in bringing on the difficulty; but it is for you to determine under all the facts and circumstances, Mr. Foreman and gentlemen of the jury, what is the truth here. If you should find that the defendant has proven by the greater weight of the evidence, not beyond a reasonable doubt, but by the greater weight of the evidence, and that means his evidence of self-defense, you put it in the balances and weigh it, and that does not mean, Mr. Foreman and gentlemen of the jury, that you should believe everything that every witness says or that you should swallow every circumstance that is detailed, but it is for you to weigh it and from your knowledge of human nature to determine what is the truth, and if he has proven to you by the greater weight of the evidence that he was without fault in bringing on the difficulty, that it was necessary for him to take the life of the deceased in order to save his own life or save himself from serious bodily harm, and that he believed that he was in danger of suffering death or serious bodily harm, and that a man of ordinary reason and courage and firmness would have

believed the same thing placed as he was placed, and that there was no other reasonable safe means of escape, then it is your duty to find him not guilty. If you find that he has failed to prove any one of these four elements, then his plea of self-defense fails. Then you will determine whether or not the State has proven beyond a reasonable doubt whether he is guilty or not guilty. He is entitled to the benefit of any reasonable doubt growing out of all the circumstances and a reasonable doubt is just what the term implies. It means a doubt for which you can give a reason; not a whimsical doubt, not a flimsy doubt, not a doubt that a man would pick out who is hunting for a doubt, but any doubt that would come up in the mind of an honest man who is earnestly seeking to know the truth. If there is such an honest doubt in your mind, then it is your duty under the law to give the defendant the benefit of it, but, if there is no reasonable doubt in your mind as to his guilt under the law as I have charged you, then it is your duty to find him guilty.

"Now, Mr. Foreman, I think that is about all the law that I want to charge you. The responsibility is yours. It is a duty that no man would crave. It is a duty that no man would seek, and yet there is but one purpose and one course to follow. This word, 'verdict,' comes from a Latin word meaning truth, and if your verdict should speak anything else, then it would have the wrong name. I think it was Ella Wheeler Wilcox who said, and I think it is a beautiful thought: 'That there are only two things that we should fear in this world. The first is that we may not know our duty, and the second is, knowing it, we might not have the strength to perform it. Only two things that we need fear: That we may not have intelligence to know our duty, or, if we have light to know it, then we haven't got strength to perform it.'

"Now, gentlemen of the jury, you must know your duty from the testimony that you have heard on that stand and under the law as I have given it to you. That is the only way you can get it, and when you have considered the testi-

mony and have found your duty, then you are not responsible for the result. You don't represent the defendant any more than you represent the State, nor do you represent the State any more than you do the defendant. When you shall have found your duty, then may you have the strength to write it on the back of this indictment, and then a clear conscience will be yours and it matters not what comes in after life, when you feel that you have done your duty under the light as God has given you to see the light, then you may fear no man nor devil. If you should find the defendant guilty of murder, you write the word 'guilty' and sign your name as foreman. In that case the penalty will be death by electrocution. If you should find that he is guilty of murder, but there are such circumstances and facts surrounding it that you should think the death penalty should not be imposed, then you find him guilty with recommendation to mercy, and in that case the punishment will be life imprisonment. If you should find that he is not guilty of murder, but that he is guilty of manslaughter under the law as I have charged you, then you will say guilty of manslaughter and sign your name as foreman. In that event the punishment will not be less than 2 years nor more than 30 years in the discretion of the Court. If you find that the State has failed to make out its case beyond a reasonable doubt or the defendant has established his plea of self-defense by the greater weight of the evidence, the form of your verdict will be 'Not Guilty,' and sign your name as foreman. Take the record, Mr. Foeman, and find a verdict."

Exceptions: "(1) His Honor erred in not excusing juror No. 17 for the reason: (a) Said juror had been a member of the coroner's jury that originally investigated the death of the deceased; (b) said juror stated he had made up his mind as to how the deceased came to his death; (c) said juror had only heard the State's testimony, and a burden was placed on the defendant to remove any impression adverse to him that had been made; (d) the Court accepted the

juror's view of whether he was or not indifferent; (e) undei all the facts developed on his examination, it did not appear that he was indifferent and did not appear that he was a proper juror to sit in that case.

"(2) His Honor erred in allowing the witness, Dr. J. K. Gilder, to testify that the deceased 'knew he couldn't live; he realized he couldn't live;' the error being that the testimony was a mere expression of an opinion upon the material ques tion as to the admissibility of the deceased's statement as a dying declaration.

"(3) His Honor erred in allowing the witness, Dr. J. K. Gilder, to testify to statements made by the deceased, the error being: (a) The statement was not shown to be a dying declaration; (b) the witness asked the deceased to make a statement for the case; (c) it was not shown that the deceased was without hope of recovery at the time of the alleged statement; (d) there was no competent testimony that the deceased was *in extremis* at the time of the alleged statement.

"(4) His Honor erred in allowing the witness, W. S. Langford, a brother of the deceased, to testify to statements made by the deceased upon the witness' arrival at the scene of the difficulty, after it was over, the error being: (a) The statement itself was a mere expression of an opinion or conclusion of the deceased and was not a statement of fact; (b) the statement was not shown to have been a part of the *res gestae,* or a dying declaration; (c) the statement was not shown to have been made to or in the presence and hearing of the defendant.

"(5) His Honor erred in allowing the witness, Dr. W. G. Houseal, to testify to statements made to him by the deceased on the day of the difficulty, the error being: (a) That the said statement was not shown to have been a dying declaration, it not appearing that the defendant was *in extremis* at the time, but, on the contrary, that he was not *in*

*extremis,* as he lived more than five days thereafter; (b) said declaration was not shown to have been a part of the *res gestae.*

"(6) His Honor erred in not allowing the defendant to answer the following question: 'Q. Did you know deceased's reputation, that is, D. A. Langford's reputation for going armed in this community?'—the error being that the testimony sought to be elicited was material and bore directly upon the defendant's plea of self-defense, and was in reply to testimony of the witness, W. S. Langford, and others for the State.

"(7) His Honor erred in allowing the witness, Mrs. D. A. Langford, wife of the deceased, to testify in reply as follows: 'Q. I wish you would state to the jury what was your husband's habits with reference to carrying a pistol? A. Well, when he came in he often went in the room and played with his little boy. * * * I simply want to tell that when he came in the house he very often played with the little boy. He wouldn't take anything out of his pocket. I shouldn't think he would get on the floor and not take anything out of his pocket'—the error being: (a) The testimony was not in reply; (b) it was an effort to bolster witnesses already offered by the State in its testimony in chief; (c) it was argumentative, and was an expression of an opinion, and was no statement of fact; (d) the Court had refused to allow the defendant when on the stand to answer a similar question, although the issue had been made by the State in opening of its testimony.

"(8) His Honor erred in charging the jury as follows: 'Human life is sacred. Mankind has been able to invent many wonderful things and do many wonderful things, but science has never yet been able to bring back a life that has been shut out. When once the spark has been put out, mankind has been helpless in all ages of the past to bring back or revivify man, and, therefore, when any one takes human life, the law places upon that act a fearful penalty, unless it

is done under certain circumstances'—the error being that this was no statement, or clarification, of any principle of law applicable to the issues in the case, and could and did only tend to confuse the minds of the jury, and tended to prejudice them against the defendant.

"(9) His Honor erred in charging the jury as follows: 'Manslaughter is usually defined as the taking of hunman life in sudden heat and passion and upon sufficien legal provocation, but even, Mr. Foreman and gentlemen of the jury, where there is provocation, there is no right to kill, unless the circumstances are such as to justify the person in making the assault to believe that he had to act in self-defense, and I charge you on that'—the error being that said charge did not contain a sound proposition of law, was confusing, and tended to leave the jury with the impression that before a killing could be reduced from murder to manslaughter that the defendant would have to show that he struck the deceased in self-defense, and denied the defendant the full benefit of his plea of self-defense.

"(10) His Honor erred in charging the jury as follows: 'Self-defense is based upon necessity, and I charge you in the beginning that human life is so sacred, human life is so sweet, that no man has the right to assault or take human life, except that it is necessary to save himself from death or serious bodily harm; so that the whole defense, Mr. Foreman and gentlemen of the jury, may be condensed into the one word "necessity." If it was not necessary to take human life, then it should not have been taken. If it was necessary and the other elements of self-defense were present, it is excusable, but it must be necessary'—the error being that the charge placed upon the defendant the burden of proving an absolute necessity for the taking of the life of the deceased, which the law does not require, in addition to the elements descriptive of self-defense; whereas, the legal necessity is inclusive of all of the elements of self-defense.

"(11) His Honor erred in charging the jury as follows: 'To make out the plea, the person setting up the plea must prove by the greater weight of the evidence, first, that he was not at fault in bringing on the difficulty, and that is a reasonable rule. It complies with good common sense and justice, because why should a man bring on a difficulty and then, being placed in that difficulty that he brought on himself, it becomes necessary for him to take the life of the person, for him to come into Court and say he had to kill in order to save his own life'—the error being: (a) Said charge did not state a sound proposition of law; (b) it was argumentative, the Judge assuming the roll of advocate; (c) it tended to impress the jury with the idea that the Court thought the defendant was not without fault; and (d) it was in effect a charge upon the facts.

"(12) His Honor erred in charging the jury as follows: 'I charge you further that a man cannot insult another and bring on a difficulty by words, or epithets, and then, after bringing on the difficulty, should he take the life of his assailant, he could not plead self-defense'—the error being that said charge was misleading in that it had no application to any issue involved in the case, and it tended to prejudice the jury against the defendant and to confuse them.

"(13) His Honor erred in charging the jury as follows: 'If you should find that the defendant has proven by the greater weight of the evidence, not beyond a reasonable doubt, but by the greater weight of the evidence, and that means his evidence of self-defense, you put it in the balances and weigh it, and that doesn't mean, Mr. Foreman and gentlemen of the jury, that you should believe everything that every witness says or that you should swallow every circumstance that is detailed, but it is for you to weigh it, etc.,—the error being: (a) That said charge tended to impress the jury with the view that the Judge did not believe the defendant's witnesses as to self-defense, as he did not use the same language or any similiar language, but, to the contrary, in

charging as to the State's burden in proving its case beyond a reasonable doubt; (b) it was in effect a charge upon the facts; and (c) it limited the jury to a consideration of the testimony of defendant's witnesses and excluded from the jury consideration of testimony from State's witnesses tending to establish the plea.

"(14) His Honor erred in refusing to charge defendant's fourth request, as follows: 'If the jury find that the defendant was without fault in bringing on the difficulty, and that he actually believed that he was in such immediate danger of losing his life or sustaining serious bodily harm, that it was necessary for his own protection to take the life of the deceased, and if further in the opinion of the jury the circumstances in which the accused was placed were such as would justify such a belief in the mind of a person of ordinary reason and firmness, then a case of self-defense is fully made out, and the verdict should be not guilty'—the error being that said request contained a sound proposition of law which was applicable.

"(15) His Honor erred in refusing to charge defendant's seventh request, as follows: 'To justify a homicide, or an assault and battery, the danger need not be actual if the accused acted on a reasonable appearance and belief of danger, where all elements of self-defense are present'—the error being that said request contained a sound proposition of law which was applicable.

"(16) His Honor erred in refusing to charge defendant's eighth request, as follows: 'Where two men engage in a quarrel, and one of them appears to attempt to draw a pistol or other weapon, the other is not bound to wait until he finds out what he is going to do; for such delay might be fatal to his life'—the error being that said request contained a sound proposition of law that was applicable.

"(17) His Honor erred in refusing to charge defendant's tenth request, as follows: 'If one without fault in bringing on the difficulty is assaulted by another apparently intending

to do him grievous injury, and of that the iurv are the judges, the one assaulted need not wait, but if, under the circumstances surrounding him, he actually believes that his life is in danger or that he is liable to suffer great bodily injury, and if the jury believe that a man of ordinary reason and firmness would have believed himself to be in such danger, and would have acted as the defendant did, then your verdict would be not guilty'—the error being that said request contained a sound proposition of law which was applicable.

"(18) His Honor erred in refusing to charge defendant's eleventh request, as follows: 'The jury should not hold the defendant to the same calm and deliberate judgment which you are now able to exercise, but you should put a man of ordinary reason and firmness in his place at the time he fired the fatal shot and judge of the defendant's act situated as he was and confronted as he was at the time he fired the fatal shot, and decide if a man of ordinary reason and firmness would have acted likewise, remembering that the defendant had a perfect right to kill the deceased if he was without fault in bringing on the difficulty, and if appearances reasonably indicated that he was in danger of serious bodily harm, and if a person of ordinary reason and firmness would have had the same belief, and there was no probably safe means of escape'—the error being that said request contained a sound proposition of law which was applicable.

"(19) His Honor erred in refusing to charge defendant's fourteenth request, as follows: 'The jury is charged that, where a plea of self-defense is set up, the defendant is not required to establish such plea beyond a reasonable doubt, but only by the preponderance or greater weight of the testimony'—the error being that said request contained a sound proposition of law which was applicable.

"(20) His Honor erred in refusing to charge defendant's fifteenth request, as follows: 'That the jurors and each of them are required by law to give the prisoner the full benefit

35—111

of all reasonable doubt; each juror to act on his own doubt, and not the doubt of another juror'—the error being that said request contained a sound proposition of law which was applicable."

*Messrs. Geo. Bell Timmerman* and *B. V. Chapman,* for appellant. *Mr. Timmerman* cites: *As to failure to excuse juror for cause:* 90 S. C. 434. *As to the admissibility of dying declarations:* 13 S. C. 463; 58 S. C. 43. *As to the refusal of trial Judge to charge the following request of defendant:* "*That the jurors and each of them are required by law to give the prisoner the full benefit of all reasonable doubt, each juror to act on his own doubt and not the doubt of another juror.*" 59 S. C. 213.

*Mr. Solicitor H. S. Blackwell* and *Messrs. Blease,* for State, respondent, cite: *As to failure to excuse juror for cause:* 32 S. C. 56; vol. I, Code 1912, sec. 4045; 26 S. C. 202; 90 S. C. 298; 3 Brevard 309. *As to the admissibility of dying declarations:* 34 S. C. 139; 26 S. C. 155; 58 S. C. 352; 60 S. C. 520; 13 S. C. 453; 110 S. C. 394; 96 S. E. 688. *As to declarations being a part of the res gestae:* 47 S. C. 13; 103 S. C. 316; 110 S. C. 394; 96 S. E. 688. *As to his Honor not allowing defendant to testify as to the reputation of deceased for going armed in the community:* 78 S. C. 38. *As to the admission of evidence in reply:* 79 S. C. 83. *As to the right of the Judge to deliver what counsel for appellant calls a moral lecture:* 39 S. C. 51; 79 S. C. 82. *As to Judge's charge:* 104 S. C. 258; 105 S. C. 289.

January 21, 1919.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

(1) The defendant was tried under an indictment for murder of Langford at the Fall term of the Court of General Sessions for Newberry county, 1916, before his Honor,

Judge Peurifoy, and a jury, and convicted of manslaughter. A motion for a new trial was made and refused, and sentence imposed upon the defendant.   After sentence defendant appeals, and by 20 exceptions imputes error, and seeks reversal.   These exceptions allege error in presenting the juror No. 17.   We think that his Honor was in error in presenting this juror, possibly as he had to sit in the coroner's jury at the inquest, and it is not good practice to allow a juror to sit as a petit juror in any case where he has been on the grand jury that returned the bill of indictment, or a coroner's jury, where the return is that the deceased came to his death by the party on trial, or where the juror has been on a panel that resulted in the Court ordering a mistrial, or a new trial has been granted by the Court after verdict rendered; but in the case at bar the presenting of the juror was not prejudicial, as defendant objected to the juror, and by so doing did not exhaust his peremptory challenges.

The jury was completed without the defendant having exhausted his peremptory challenges, and that excuses any error on the part of his Honor in presenting the juror, and the exceptions complaining of error on the part of his Honor in reference to this juror are overruled.

(2) The next questions to be considered are the exceptions that allege error on the part of His Honor in the admission of evidence as dying declarations.   The exceptions complaining of error in this particular are overruled.   His Honor had ample authority to rule as he did under numerous decisions of this Court.   *State v. Johnson,* 26 S. C. 155, 1 S. E. 510; *State v. Bradley,* 34 S. C. 136, 13 S. E. 315; *State v. Lee,* 58 S. C. 352, 36 S. E. 706; *State v. Head,* 60 S. C. 520, 39 S. E. 6; *State v. Wideman,* 96 S. E. 688.

(3) The next questions to be determined are the exceptions which allege the improper admission of evidence as part of the *res gestae.*   These exceptions are overruled under the authorities of *State v. Arnold,* 47 S. C. 13, 24 S. E.

926, 58 Am. St. Rep. 867; *State v. Thomas,* 103 S. C. 316, 88 S. E. 20; *State v. Wideman, supra.*

The next exceptions complain of error in allowing the State to improperly introduce evidence in reply. This was a matter largely in the discretion of the Circuit Judge, and we see no erroneous exercise of that discretion. The safer practice is to ask the trial Judge to be allowed to rebut any new matter that is brought out in reply, but in this case we cannot see that the defendant was prejudiced or deprived of any substantial right. These exceptions are overruled. The other exceptions complain of error on the part of his Honor in charging the jury. Taking the charge in its entirety, we fail to see where the defendant was prejudiced to such an extent as to work reversal. He charged the jury in his own language the principles of law governing the case. All exceptions are overruled.

Judgment affirmed.

MESSRS. JUSTICES HYDRICK, FRASER and GAGE concur.

MR. CHIEF JUSTICE GARY, disqualified.